Next on the calendar is number 203659 United States v. Jean Next on the calendar is number 203659 United States v. Jean Mr. Ferrante, whenever you're ready. Good morning, your honors. May it please the court, my name is Joseph Ferrante. I am the attorney for the defendant appellant Spencer Jean. I think it's important to state at the beginning that I was not trial counsel in this case. There were actually, I believe, two or three prior attorneys before I entered the case assigned to represent Mr. Jean for post-conviction relief, potential post-conviction relief, and sentencing and now appeal. All of my points, barring the last point, are all connected to the same concept, which is the cellular site data, that of the geolocation, all the way down to the simplistic data of one phone texting another and what was being said. For the first point, being the Rule 16 violation that I believe is the most important part of this appeal, I go back to the April 17, 2019 conference before then District Judge Bianco, when Mr. Jean's prior attorney, Mr. Finkel, made a specific request and he said, I'd like to know when the expert reports the cell tower information is going to be very important to us as Your Honor has granted us a cell tower expert. So I'd like to know when we're going to get that from the government. The government replied, just one second please, Your Honor, two weeks before trial is what we would suggest, maybe the end of next week. The court said okay. Mr. Finkel said, Your Honor, I need time for whoever, the expert that we ultimately retain to review and consider it. Two weeks doesn't give us much time. The judge then said, well, first of all, today we're on the 18th of April, so they say they need another. It's not that you have the report. Do you have a report? The government said, no, Your Honor. The court said, I mean, they don't have the report, so by no later than the end of the week, but I'd ask the government to return if you get the report before next Friday to turn it over immediately. The government said, yes, Your Honor. And the court said, I mean, we're doing the best we can, Mr. Finkel. Obviously, you know May 13th is very soon, but I'm trying to get you that information as soon as possible. Now, that was referring to a May 13th trial date that was previously set at that point in the middle of April. From that moment, things happened. Judge Bianco came to join the Sistine Court. I believe that the case was turned over to Judge Seibert down in the district court. There were some allegations of a false alibi presented against my client, which then made Mr. Finkel disqualified as counsel. A next counsel was brought in, Mr. Haley. And through all of that, the message was lost, and that report was never turned over to the defense. Not until late in June and early July, via email, did the government turn the report over from an expert named Magnuson by email on the Saturday prior to Mr. Magnuson's testimony. Did counsel object to the timing of the disclosure? Counsel Haley did not object. What he did was he stood up and candidly told the court, I've never seen this report. And the government said, oh, we emailed it to you over the weekend. And Mr. Haley said, frankly, Judge, I don't check my emails while I'm working on trial. I basically live at home. I don't go to my office. And this frankly damning report that was based on hundreds of pages of data, pinpointing locations of not just my client's phone, but of two other phones. But you'd gotten raw cellular, excuse me, data before that, correct? They did. And here's the problem with that data. No, but you can address that in a minute. But I just want to be sure that I understand what trial counsel did in connection with this disclosure you've just been telling us about. What happened after that? The judge, well, I guess we'll be- What did Mr. Haley say? Mr. Haley basically said, well, to paraphrase, Mr. Haley said, Judge, I haven't received it. May I have some time to review it? And the court said, how's 15 minutes? And what did he say? He said, sure. I have no intention of delaying this proceeding. That's what he said. And that ties into my ineffective assistance of counsel claim, that I believe that is highly ineffective, because you're presented with a report summarizing data that you're just simply not prepared for. When did the expert testify? On the- So we're talking Monday now, right? Yes. And so when did the expert testify? July 1st.  July 1 is when- Is that a Monday? It is. Okay. Can I ask a question about, I should know this, but if you were directly appealing the Rule 16 violation, we'd be on plain error review given the lack of objection. What I'm trying to figure out is whether, because this was an issue argued in the Rule 33 motion, and because our standard of review is abuse of discretion, whether that gives you the benefit of a slightly more forgiving standard of review because we're reviewing the Rule 33. I'm not sure that there's that much benefit, per se, to bringing it. Okay. What I followed as far as this court's law is the Cantoni case that happened relatively recently. And I had cited to it while it was still at the district court level in my Rule 33 motion. And what I found interesting about the way it was treated at the district court level was it said, the judge said on a decision of March 31st, 2019, explaining that the government had finally disclosed properly and now offers sufficient detail to enable defense counsel to understand the opinion of the expert will offer and to prepare a response. It includes the expert's CV as well as a 10-slide presentation documenting his analysis. This comes on top of the extensive cell phone records previously produced. All we got, and again I say we, I wasn't there, but what Mr. Gene got was just the data, nothing more. And when the government. What can cell site data be used to prove other than location? Isn't it sort of obvious what the data was going to be used for? Yes. And that's when the web of this argument comes in, which is the native format data that was provided was actually missing the latitude and longitude of the two crucial phone calls that plotted my client's phone in a certain location. One set of data had it. That was from a subpoena by the DA's office in Suffolk County. The next set of data, it was missing. The next set of data, it was there. All of that data was crammed together into one big exhibit at trial. Now, had Mr. Haley had the time to take the data, present it to his expert, and show here's what the report is showing, that expert would have gone to those specific phone calls and said, look, if data set number one is correct, then I have no way of knowing whether data set number two is correct, as opposed to data set number three. They were all included in one big exhibit. Were there differences among the data sets other than the omission of data in data set number two relative to those two calls? I believe if you, there were hundreds of phone calls and updates. I believe that there were probably many other phone calls that also had missing data, skipped data, et cetera, which is why in terms of relying on one, it doesn't give you really any benefit to knowing which one should be relied, which one shouldn't. So Mr. Haley was placed in an impossible position. Unfortunately for him, he also notified the court that he had hired a cell site expert. He never did. And I know it's outside the record, but I did it for fear of misstating anybody's position. I checked with that expert to make sure. Did anybody ever hire you? And the answer was no. He was never hired. So Mr. Haley was just simply in a position where, and again, to his benefit, this was an issue that maybe Mr. Finkel was really zeroing in on. By the time Mr. Haley got on the case, maybe he wasn't as zeroed in on that point as Mr. Finkel was at that particular time. But the bottom line is the most important calls, the ones that, according to the expert report, essentially have two dots that are very close to the victim's home. And of course, the government went out of their way to continually say, these calls do not specifically state where, a particular spot, and that's fine. But when a jury is looking at a screen that shows a dot and the home address of a victim, saying that is- So I understand. What was that evidence offered to show? Because the government, it seems to me, do, and at this point, obviously, they get significant inferences in their favor. A lot of evidence of your client's guilt. I actually disagree. Where the cell data is going is that it supports the alibi defense that he really wasn't there? It could have. He wasn't at the- The victim's home? Shooting the guy over the marijuana. Yeah, it could have supported that because he says that he was in the general vicinity, which, with an expert of Southside technology that all agree, sometimes a call does not go to the strongest tower. A call could go to the next tower. We're talking about an area of Long Island that is- There were enough towers there where his phone could not have been there. But either way, he never had an opportunity of showing that because he didn't have an expert of his own, and that placed him in that position. The other part of this is the cell site data can be looked back to the actual call data, where the victim says, me and Spencer Jean spoke the night before and set up a marijuana deal. And the call records, these are now specific phone-to-phone records, show that those calls never happened. They did not speak the night before. So this grand plan to set up a marijuana- That was a Snapchat or something, right? Wasn't there some other means of communication? I believe Snapchat came up as what we'll call the marketing marijuana video was supposed to have used Snapchat to send from the victim to my client. The point of my question, what's the prejudice? How would you articulate sort of the argument that you're making in terms of how to prejudice your client? This goes to the argument of jurisdiction of targeting a marijuana dealer. Without the marijuana, my client said he was going over there to buy some laptops from the guy. After the victim calls 911- What about Getz's testimony? As far as the timing of the phone calls, I believe it was all perjury testimony. And, of course, I understand- That was for the jury. Right. And so every time we say it's up to the jury to determine credibility and we will not step in the way of that, I look to the Pauling case and I say of the impermissible inference for a person when the government knows the phone call never happened to stand up and say the night before me and Gene spoke, we went over what I was going to sell him, how much it was, all that other stuff. Well, didn't Getz testify that he and Mr. Gene had arranged a drug deal and was going down the next day and testified about the details of it? Correct. Why wasn't the jury entitled to credit that? Because they never spoke the night before. Well, Getz- They never spoke the day before. Getz said they did. Right. And his phone records show they didn't. So he should have just been told, listen, Mr. Getz, we appreciate that you want to make a story of the night before, but at the very least we need the jury to hear the truth and we have been in possession of the truth because we have your text messages, so do not talk about the night before because you did not speak to Gene the night before. And if we're taking, if we're using cell phone evidence as accurate, then we have to really use it as being accurate. We can't just let somebody say a phone call happened. Then that phone call actually did not happen. Now the jury is determining credibility, which they're supposed to do, but they should have never been shown that or told that information when the government knows it's absolutely just not true based on their own records. Wasn't he cross-examined on that phone? He was. And he was asked, you sure, you sure you spoke the night before? Yes, I was. Yes, I definitely spoke to him the night before. I'm sorry. No, no, I agree. Wasn't there evidence that they had spoken the next morning? Yes. So if the inaccuracy in the testimony was not as to the fact that they confirmed to set up the transaction, but was as to whether it was the night before versus the morning of, would that rise to the level of we can conclude it was knowingly introducing perjured testimony? Yes, because the important part there is the addition of the marijuana sale video. That does not exchange hands in the morning. It's not in the text messages. It's not there that morning when they're talking. The morning is I'm on my way, here's my address, I got you, that sort of thing. Can you help me understand the Snapchat piece? I was a little confused about the record. Yes. I thought I read it someplace that in the discovery from Snapchat, there was no evidence of any Snapchat video exchanging hands either the day before or the day of. Am I understanding that right? And if so, can you point me where in the record I can find the return on that to confirm that? I actually believe that that, and the government could probably speak to this question better. I believe that the Snapchat subpoena came back with nothing relevant. And is the return that comes back with nothing relevant in the record somewhere that I can look at? I believe the government probably has that. I don't know specifically if in the record there's a spot where it says Snapchat has nothing to offer. What I did was research how Snapchat would work, and while Snapchat technically is secret and things disappear and that sort of thing, while the video itself of this marijuana would not appear in a return, the contact between the two people would show. So it would be the night before, June and Getz are on Snapchat. Something is exchanged. We don't know what it is. Now, that would support Getz saying, well, that's when I sent the video out. Instead, he said, I videotaped it on my father's phone because I didn't want to have it on my phone, and then it was deleted, but then we found it. But how did June get it? Well, June got it through Snapchat. And that bears your jurisdiction because that's the reason June's there, for a marijuana dealer. Getz says it was for jewelry. June says it was for laptops. I don't believe the marijuana in this case was recovered. I don't believe the gun in this case was recovered. And after reading this court's decision on Cantoni, which just came out recently, the section that caught my eye was, a showing of substantial prejudice requires that the defendant demonstrate that the untimely disclosure of the evidence adversely affected some aspect of his trial strategy. As the government conceded an oral argument, it did not promptly comply with its discovery obligations. Nevertheless, it argues correctly that Cantoni failed to demonstrate he was prejudiced by the timing. Cantoni offers only speculation. After finding those missing phone calls, if that expert was there, with or without having had the report, and somebody had a sticky note that said, question him about the native data. Ask him to show you where he plotted the longitude and latitude from. I believe that would have been a very strong thing that could have never happened. Are you now shifting back to the geolocation data? I am. The existence of a Snapchat communication? Yes, I'm sorry. I apologize. Thank you. Thank you, Counselor. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the court. My name is Anthony Bagnola. I represent the government in this appeal, and I was trial counsel for the government below. As the trial assistant on this case, I can tell this court that the defendant was convicted upon competent evidence, and after a fair and speedy trial, and that none of the alleged errors raised in this appeal justifies reversal by this court. Were you late turning over, making some of these disclosures? I respectfully disagree, Your Honor, and here's why. This entire case, from indictment to jury selection, lasted a total of about three months, about 100 days. That would have been an extremely compressed timetable to produce discovery, engage in motion practice, exchange all pretrial disclosures under normal circumstances. I thought the government was always ready. The government is always ready, Your Honor, and in this case, we certainly respected Judge Bianco's deadline to produce expert disclosures under Rule 16 by a particular date and time. And we produced everything that we had by that date, despite the fact that we hadn't yet retained an expert, and we produced more prior to trial with enough time for the defendant to use it. But your adversary's main argument is that the key document was turned over moments before the trial started. And I think that's a characterization of key document. When the court looks at what Rule 16 actually requires, there is no mention of a report. Rule 16 doesn't require a report. That was a term that Judge Bianco used orally on the record at a status conference, and there's no clear indication in the record that Judge Bianco intended for that term to carry the legal significance that's currently being attached to it in this appeal. Rule 16 requires only that the government disclose an expert. What was your intention with respect to the expert's report? The government's intention- Once you concluded that Rule 16 didn't pertain to such reports and that Judge Bianco had misspoken, what was your intention? Well, our intention is exactly what happened, which is we disclosed the expert's name, a full CV, a list of 79 state and federal cases in which he'd previously testified as an expert, and gave the defendant the exact base range of the documents in discovery as to which he would base his opinions. But you didn't disclose the opinions until the Saturday. The trial had actually started, right? It was the Saturday before the Monday when he testified. You finally said, here's the opinion as reflected in these slides. Well, Your Honor, on April 26th, the deadline set by Judge Bianco, we didn't have those slides. We didn't even have an expert under retention. And, again, I go back to the extremely compressed timetable under which we were working. In the course of three months, we did multiple rounds of discovery, substantive motion practice, all of the pretrial disclosures. Yes, but the government's always ready. That's one of the things I learned early on as a federal judge. Yes, Your Honor, and that's why on the date we were directed to do so, we did give a summary of the expert's opinions, albeit a brief one. And when we had more available, which was on June 29th, we produced it immediately. This is plain error, right? The standard that this Court applies is plain error. For this particular point, we've been going back and forth on about the timing of the disclosure of the report, because there was no objection to it. Correct, Your Honor. There was no request for a supplemental disclosure, no objection, no request for a continuance, nothing that would indicate. And so it's plain error? Yes, Your Honor. Yes, Your Honor. But when you say you gave a brief summary, you said what the subject matter would be, but you didn't say what the opinion would. He's going to testify essentially about the geolocation, not he's going to testify that the geolocation data shows that defendant was here at the critical moment. Your Honor, I would submit that when the government said the expert is going to say where the defendant was, it was abundantly clear what where he was meant. And that's what the district court found in denying the Rule 33 motion. On March 16th, 10 days after the indictment and before any discovery was produced in the federal case, the defendant told a government witness on a recorded phone line, they have my phone in the area. That's before the government produced any discovery. So by virtue of discovery in the state case, he already knew. And I'll add, Your Honor, as early as May 6th, 43 days before trial, the government produced 3,500 material from numerous witnesses, including Getz, indicating the government's obvious intent to place the defendant at the crime scene. So at this point, it's implausible for the defendant to suggest he did not know the government would try to place him at the crime scene using the geolocation data. That's where we contended he was. And as this court has already, well, as questioning of my friend has already revealed, the defendant's own alibi placed him there, too. As the record makes clear, the trial strategy of the defense was never to poke holes in the cell site data. It was never to suggest he was in Texas when the cell site data placed him on Long Island. They embraced the cell site data as supportive of the alibi that he was actually going to Getz's house. He conceded. We were texting that morning. He gave me his home address. Putting the cell site evidence aside, what was the government's main evidence that Mr. Jean went out to the location on Long Island and shot the man in the leg during the course of their transaction? Yes, Your Honor. And I think that's an important question because the evidence setting aside the cell site data was overwhelming in this case. That's your question, I understand. Yes, principally because Ryan Getz, the victim, lived to tell the jury what happened. He testified, not only did this person come to my house and rob me of marijuana and shoot me, but we knew each other. We lived together. This was not a case of mistaken identity. I texted him a video of the marijuana the night before. And on that point, Your Honor, I'll note the record does not say in Getz's testimony, I called him on the phone number that's in those phone records and we spoke on the phone. He was effectively cross-examined. Was it a phone call? Was it a text message? He said, I don't remember. And it was him trying to recall a communication between Was there evidence that would have supported the notion that it was a text message the night before rather than oral communication? Well, Your Honor, I think it's important to note how much circumstantial evidence there was to corroborate the substance of these phone calls. No, no, I understand all the other evidence. But one of the things I felt like the briefs were arguing past each other on the call information and the Snapchat information because the government appropriately emphasizes all the other evidence that's there. But am I right that Getz testified with great confidence and repeatedly elicited by the government that he had communications the night before when the third party neutral objective evidence doesn't document any communications the night before, be it by Snapchat, by text, or by conversation on the cell phone? Well, for starters, Your Honor, Snapchat evidence was never introduced at trial either by the government or by the defendant, even though it was produced in discovery. It was equally accessible to both sides. Nobody used it because, as my friend has pointed out, Snapchat, their whole Mr. Getz testified that he Snapchatted the video of the marijuana in advance, didn't he? Yes, but the Snapchat records didn't bear that out. The Snapchat records came back and said, we have no data to share with you. Right, so the government elicited that testimony from Mr. Getz knowing that it was actually contradicted by the objective third party evidence that the government was relying on in other aspects. No, Your Honor, not contradicted, just not corroborated. The Snapchat records didn't say one way or the other whether this happened, and that's another important aspect here because when you look similarly at McPherson's testimony, the defendant's appeal suggests McPherson lied because she said, I spoke to Mr. Gene the morning of the shooting and it's not in his phone records. Well, if you take a closer look at the record, she said that they used FaceTime to talk. FaceTime is not a phone call. It's an Internet-based app that doesn't show up on toll records. So as the trial assistant, I can tell you, in order to make a finding that there was stubborn perjury here, the government's intent matters. On the whole, we had no good faith basis to believe that Getz or McPherson were lying as to the essentials of their testimony. So is the Snapchat, is the return to the warrant to Snapchat in the record somewhere? Can I ask Your Honor to repeat that question? Is the return from Snapchat to the warrant, we hear one person saying it contradicted the possibility of a Snapchat communication. I think I hear you saying it was neutral as to the existence of a Snapchat communication. Is that return in the record, the document from Snapchat that I spoke in? No, I'm sorry to cut you off, Your Honor. No, the answer is no, because it was never introduced at the trial or in any underlying pleadings in the district court. The government turned over what it had by way of a return from Snapchat and said, this doesn't say anything one way or the other. And I presume from the defendant's decision also not to use that at trial, that it didn't say anything helpful to the defense in that regard either. That's why I would respectfully push back on the idea that it's contradictory to that it didn't corroborate it. But as I said, Goetz's testimony was corroborated in numerous other ways with respect to the content of that call. So rather than focusing on the timestamp on the particular call and whether it shows up in one specific set of records, despite the fact that there was no evidence of which device anybody was using during this phone call, Goetz couldn't remember. His recollection of setting up a marijuana deal was corroborated not only by the video that was shown to the jury of him advertising the marijuana that he claims was later robbed from him in the morning. It's consistent with him having lived in the halfway house with the defendant. He testified, and it was uncontroverted, that he lived in a halfway house with the defendant and that as a result of their acquaintance in the halfway house, he knew the defendant to be a marijuana dealer. And he testified that John shot him. Yes. In connection with a drug deal. Yes. Marijuana deal. And similarly, Your Honor, Nastasia McPherson is the defendant's former girlfriend. She was actually disclosed not by the government. She's not a government. She's not under any agreement with the government. She was the defendant's alibi witness. He said, I'm going to assert this alibi at trial that mirrors the cell site data that puts me in that general vicinity and McPherson will tell you that she was there with me. McPherson, when she was interviewed by the government, said none of that is true. In fact, the defendant spoke to me that morning on FaceTime and said, I'm going to see the guy from the halfway house about some marijuana. That also corroborates Goetz's testimony that this was a marijuana deal. There's no evidence that's been introduced in any of the underlying proceedings or at the trial to suggest that this alibi of a laptop sale gone wrong by two former drug dealers is in any way supported. Thank you, Mr. Tegnelli. Thank you. Yes. Thank you, Your Honors. Mr. Ferrante, you're reserved two minutes for rebuttal. Yes, Your Honors. Thank you. The one thing I want to say back on the presentation the government just gave is that they talk about a condensed case, condensed timing. In discovery, there was a cover page from a Roger Santos custodian of records at T-Mobile from October of 2018. So the government was in the process, Suffolk County and the U.S. government, were in the process of getting these records far sooner than the moment that Judge Bianco made that order. I read it as an order to the government. And to say that Judge Bianco was not necessarily telling them that I want you to give them the report, the expert report, I don't find that credible at all because if raw phone data is not the report and if what the government likes to call summary slides are not the report, then what is a report exactly? And what exactly are we, as defense attorneys, when we're asking for these things under Rule 16, what are we actually asking for? Getz was hospitalized as a consequence of the shooting. Yes, Your Honor. And there's no question that he was shot. The question, from your perspective, is who shot him. Who shot him. So in order for you to carry the day here before us, we need to be convinced, and correct me if I'm wrong, that Getz' testimony about a drug deal with John and being shot by him was knowingly perjured testimony that shouldn't have been deduced. And we are, from that benchmark, obligated to reverse the judgment. I don't agree necessarily with that. I guess what I feel that I have to prove is that Gene was not given a fair trial. Please help me out. That Gene was not given a fair trial. And I'll remind you, Your Honor, that Getz calls 911 and gives an entirely different story. He tells the police an entirely different story. And that is why this case started as a state case because there was no jurisdiction. Without a drug deal going down, there's no jurisdiction for the federal government. Gene was on supervised release. Are you not telling us that we have to, that we are legally obligated to ignore the whole thing? No, I'm not saying that at all. I'm saying that if you review Getz' testimony, that he's far from consistent from the moment he calls 911 to where he's positioned to looking out the window. Everything he says is a lie. He was in prison for lying. That's what we have juries for. And I agree. And the problem I have with that concept in this case is the jury should have, at the very least, been presented with accurate testimony of what went down with the telephone calls and the setup and the planning of a marijuana deal that springs federal jurisdiction into this case. And yes, of course, at that moment, the jury should be given all credibility and left alone to make that decision. Instead, they were presented with this planning call and we set it up. Bottom line is Spencer Gene and Mr. Getz were at a halfway house together once. And this morning phone call is the first time they ever communicate on the telephones from that day. Thank you both. We'll take the case under advisory. Thank you.